Leroy E. GERFERS, (Plaintiff) Appellant,

v.

MISSOURI–ILLINOIS TRACTOR AND EQUIPMENT COMPANY, Inc., a Corporation, (Defendant) Respondent.

No. 31276.

St. Louis Court of Appeals.

Missouri.

Nov. 19, 1963.

Henry C. Stoll, Hinkel & Carey, William L. Mason, Jr., St. Louis, for appellant.

Rene J. Lusser, Rene E. Lusser, Lusser & Morris, St. Louis, for respondent.

WOLFE, Judge.

The plaintiff brings this action to recover damages for personal injuries which he suffered. The injuries were occasioned by an accident that occurred when he was working on a tractor leased to his employer by the defendant tractor and equipment company. There was a verdict and judgment for the plaintiff in the sum of $9,000. The defendant filed a motion to set aside the verdict and judgment, and to enter a judgment for the defendant in accordance with its motion for a directed verdict filed at the close of the evidence. The court sustained this motion setting aside the verdict and judgment, and entered a new judgment in favor of the defendant. The plaintiff in due time appealed, and seeks to have the original verdict and judgment reinstated.

The facts of the matter are to be drawn from the plaintiff's evidence, as the defendant stood upon its motion for a directed verdict to close the plaintiff's case. There is no dispute about any material fact before the court. It appears from the evidence that the plaintiff was employed by a person named Gutermuth, who was a contractor engaged in the excavating business. The plaintiff's work consisted of operating crawler-type tractors and other equipment.

On July 18, 1952, the plaintiff had completed his work shift and was asked by his employer to help put a crawler track on one of the tractors. He went to the tractor, where there were present four or five workmen and Mr. Gutermuth, his employer. The tractor was up on blocks, and the track was on the ground beneath the wheels over which it was to run. The front wheel was an idler, and there were two central idlers or rollers over which the track had to be placed. The rear wheel over which

the track operated was sprocketed to fit the inner portion of the track and to make it turn when in operation.

The object of the work was to put the strip of track on so that it ran over both the front and back wheels and rested upon the central rollers. When it was so positioned, the ends were to be fastened together by a pin designed for that purpose. When the track was in proper position for connecting the ends, it was found that the ends did not meet and that there was a space of about six inches between them.

In order to bring it together so that the ends could be buckled, another machine was brought up. This was called a "cherry picker", and was a crawler tractor equipped with a power crane. The crane consisted of a boom that moved in a lateral and vertical arc with a cable extending from the end of the boom. The cable was pulled by a power winch. The cherry picker was placed in front of the tractor upon which the men were working, and the cable was attached to the end link in the part of the track that came over the sprocketed wheel on the rear of the tractor. The purpose of this was to pull the back end of the track forward so that it could be buckled to the front end. As stated, the tractor was up on blocks. With the motor running, the sprocketed back wheel could be put in reverse motion to exercise a pull on the track opposite to the pull by the cherry picker. It was intended in this manner to stretch the track by taking up any slack between the links.

One difficulty with the operation was that the pull by the cherry picker was not only forward but somewhat upward. This would prevent bringing the ends into a buckling position when the proper length had been obtained. In order to overcome this lifting of the track, a long timber was placed over the pulling cable, with one end of the timber under the tractor frame and with the timber projecting at a right angle for about twelve feet out from the side of the tractor so that it could be used as a lever to hold the cable down.

The men present would put their weight upon the far end of the improvised lever. When the tractor was engaged in a forward motion the cable would slacken, and when the motor was reversed to a backward motion the cable became taut. The forward and alternate backward pull had been accomplished several times, moving the track just two or three inches with each operation. The distance between the ends to be buckled had thus been reduced to about two inches.

When the operation had progressed to this point, the plaintiff was on the far end of the timber so that his weight would hold the cable down. The motor of the tractor was put in reverse and the cable became taut. This threw the timber upward. The plaintiff fell from it and the timber came down and struck the plaintiff, inflicting the injuries for which he seeks recovery.

At the time of the accident a man named Gage was seated on the tractor and operating the controls. He was employed as a skilled mechanic by the defendant tractor and equipment company. He was called by the plaintiff as a witness. He testified that the defendant company leased and sold equipment, such as graders, cranes, tractors, and other machines of similar character. The defendant company sent him out to do mechanical work on various machines that they had sold or leased to contractors. About fifty to seventy-five percent of his time was spent on such work away from the shop of the defendant. His wages were paid by the defendant tractor and equipment company, and the person for whom the work was done was billed for the services rendered by the defendant. He was usually instructed by the defendant as to the particular work which he was to do for a customer, but if the customer's credit was good he could do other work at the customer's request.

He had been sent to the contractor Gutermuth to put a new transmission in the tractor above mentioned. He had done this work, and after completing it he had worked on the motor of another piece of equipment. He also had finished his normal day's work when he was asked by Gutermuth to help put the crawler track on the tractor that he had previously repaired. He went to the site of the work, and there were four or five men working at the job replacing the track, with Gutermuth supervising the work. At Gutermuth's request he got on the tractor and sat in the driver's seat. He could not see the crawler track of the tractor from the seat, and he was directed by Gutermuth as to when to move the track forward and when to back it up. On the question of directions by Gutermuth, the plaintiff stated: "I don't recall, I don't recall getting much instructions from anyone, we just let the workers trying to put the track on, they were pretty well putting on that type of work, I don't recall too much instructions from anyone." The plaintiff, however, at no time contradicted the statement by Gage that he operated the controls of the tractor as directed by Gutermuth. At Gutermuth's direction he put the tractor in reverse, and the tightening of the cable of the cherry picker caused the resulting accident to the plaintiff, as stated above. An employee of Gutermuth was operating the cherry picker which exerted the pull forward. Gage testified that he had never seen an operation such as Gutermuth was conducting in his efforts to put the track on the tractor.

It was upon the foregoing evidence that the jury found for the plaintiff, and the court, in accordance with defendant's motion, set aside the verdict and judgment and entered a judgment for the defendant. The court held that Gage was not acting within the scope of his employment with the defendant equipment and tractor company at the time of the occurrence. It held that he was, as a matter of law, a servant of Gutermuth at the time that the plaintiff was injured, and that therefore the defendant was not liable.

It is the plaintiff's contention that the court erred and that the defendant Missouri-Illinois Tractor and Equipment Company, as general employer of Gage, is liable for Gage's negligence.

■ This presents a borrowed-servant problem. The basis of holding a master liable for the act of the servant rests upon the maxim "respondeat superior". This simply means that the master must respond in damages if another is injured by the negligence of the master's servant in doing the master's work. Liability for the tortious act is to be determined by the facts which disclose whether or not the tortious act was done while the servant was acting within the scope of his employment. 3 Am. Jur.2d, § 267; 35 Am.Jur. § 552; Vert v. Metropolitan Life Ins. Co., 342 Mo. 629, 117 S.W.2d 252, 116 A.L.R. 1381; Douglas v. National Life & Accident Ins. Co., 236 Mo. App. 467, 155 S.W.2d 267. When the servant is borrowed there frequently arises a question as to whether he is the servant of the borrower or the lender at the time of a tortious act. This is the problem presented here.

The plaintiff asserts that Gage was in the general employ of the defendant at the time in question. There is no dispute as to this. In asserting the liability of the general employer the plaintiff places his reliance chiefly upon two cases: O'Brien v. Rindskopf, 334 Mo. 1233, 70 S.W.2d 1085, and State ex rel. Chapman v. Shain, 347 Mo. 308, 147 S.W.2d 457.

The O'Brien case was a suit against an undertaker who for a consideration loaned a truck and a driver to another undertaker to carry flowers. The truck collided with an automobile in which the plaintiff in the case was riding, and she sued the owner of the truck. The court held that the driver of the truck was not under the control of the borrowing undertaker, but was under the

control of the lender. The truck and driver were loaned for a specific purpose and were engaged in the work for which they were loaned. The driver received practically no directions from the borrowing undertaker. It was quite obvious that the lending general employer was liable for the tort of the driver.

Factually, the case of State v. Shain, supra, is quite similar. There the servant, the driver of the truck, was employed and directed by an independent contractor, and the party for whom the contractor was working was held to be not liable for the driver's tort.

Neither of these cases conforms to the facts before us. More in point, yet still differing somewhat from the facts present here, is the case of McFarland v. Dixie Machinery & Equipment Co., 348 Mo. 341, 153 S.W.2d 67, 136 A.L.R. 516. In that case a WPA worker was injured when he fell from a tractor owned by the Dixie Machinery & Equipment Co. The driver and the tractor were rented to the City of Kansas City for WPA work, and the driver operated the tractor under the direction and control of the WPA superintendent. The court held that the lending master was not liable. It stated (153 S.W.2d 1. c. p. 72): "* * * an employer is liable 'only when the relation of master and servant is shown to exist between the wrongdoer and the person sought to be charged with the result of the wrong at the time of the injury, and in respect of the very transaction out of which the injury arose.'" See, also, Patton v. Patton, Mo., 308 S.W.2d 739, and Coble v. Economy Forms Corporation, Mo.App., 304 S.W.2d 47.

In McFarland v. Dixie Machinery & Equipment Co., supra, the court quoted with approval from the American Law Institute's Restatement of Agency (sec. 227):

"Since the question of liability is always raised because of some specific act done, the important question is not whether or not he remains the servant of the general employer as to matters generally, but whether or not, as to the act in question, he is acting *in the business of and under the direction of* one or the other. It is not conclusive that in practice he would be likely to obey the directions of the general employer in case of conflict of orders. The question is as to whether it is understood between him and his employers that he is to remain in the allegiance of the first as to a specific act, or is to be employed *in the business of and subject to the direction of* the temporary employer as to the details of such act."

Further, in the same section of the Restatement, it is said (p. 504):

"The fact that he obeys the requests of the temporary employer as to the act does not necessarily cause him to be the servant of such employer. If, however, the temporary employer exercises such control over the conduct of the employee as would make the employee his servant were it not for his general employment, the employee as to such act becomes a servant of the temporary employer."

The Restatement illustrates the above statement in part as follows:

"P rents to B for a week a truck and a driver, A, at two dollars per hour, to do general express work, but not to load or unload the truck. A, however, at B's request and under his directions, loads the truck. In this, A is the servant of B."

█ The foregoing example falls within the facts here under consideration. Gage was sent to do the work of a skilled mechanic. He was asked by Gutermuth to operate the tractor, which was something not in any way connected with the skills for which he was employed. He was completely under Gutermuth's direction, and from his seat on the tractor he could not even see the progress of the work that Gutermuth was direct-

ing. For these reasons it is apparent that the court properly entered a judgment for the defendant equipment and tractor company.

The judgment is affirmed.

RUDDY, P. J., and WILLIAM M. KIMBERLIN, Special Judge, concur.